UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:09-CV-123-BR

NEW CINGULAR WIRELESS PCS, LLC, on          )
behalf of itself and its wireless operating affiliates,  )
d/b/a AT&T MOBILITY, and ALLTEL             )
COMMUNICATIONS, LLC,                        )
                              Plaintiffs,    )
                                             )
              v.                             )
                                             )
EDWARD S. FINLEY, JR., CHAIRMAN;            )                    ORDER
WILLIAM T. CULPEPPER, III,                  )
COMMISSIONER; LUCY T. ALLEN,                )
COMMISSIONER; BRYAN E. BEATTY,              )
COMMISSIONER; SUSAN WARREN RABON,           )
COMMISSIONER; LORINZO L. JOYNER,            )
COMMISSIONER; TANOLA D. BROWN-              )
BLAND, COMMISSIONER (in their official      )
capacities as Commissioners of the North Carolina )
Utilities Commission; ELLERBE TELEPHONE     )
COMPANY, RANDOLPH TELEPHONE                 )
COMPANY and MEBTEL, INC.,                    )
                              Defendants.[1]  )


This matter is before the court on cross-motions for summary judgment by all parties.

The motions have been fully briefed and are ripe for disposition.

I.  BACKGROUND

Plaintiffs New Cingular Wireless PCS, LLC, d/b/a AT&T Mobility ("AT&T Mobility"),

and Alltel Communications, LLC ("Alltel"), provide commercial mobile radio service

("CMRS") in North Carolina and will be referred to as "CMRS providers" or "plaintiffs."  See

Compl. ¶¶ 4-5.  Defendants Ellerbe Telephone Company, Randolph Telephone Company

---

[1] While the action has been pending, two defendants named as Commissioners in the complaint are no longer serving on the North Carolina Utilities Commission.  Their successors are named as defendants pursuant to Fed. R. Civ. P. 25(d).

("Randolph"), and MebTel, Inc. ("MebTel") are local exchange carriers ("LECs") providing telephone service in rural areas of North Carolina, and thus will be referred to as "RLECs" or "the RLEC defendants." Id. ¶¶ 6-9. The remaining defendants are Commissioners of the North Carolina Utilities Commission ("NCUC") and are "being sued in [their] official capacit[ies], for declaratory and injunctive relief only." Id. ¶ 10.

In 2005, the RLEC defendants formally requested interconnection with plaintiffs. Id. ¶ 19. See also Mem. Supp. Pls.' Mot. Summ. J. at 7. Plaintiffs and the RLEC defendants were unable to agree on the rates, terms and conditions for interconnection and, in particular, on the rates of payment of reciprocal compensation. In September 2006, when certain issues remained unresolved, the RLEC defendants filed petitions for arbitration with the NCUC pursuant to § 252 of the Communications Act of 1934, as amended by the Telecommunications Act of 1996, 47 U.S.C. § 151 et seq. ("the Act"). Compl. ¶ 30. The NCUC consolidated the petitions, and, after an evidentiary hearing in April 2007, issued a Recommended Arbitration Order ("RAO") on 20 December 2007. Id. ¶¶ 31-33. The parties filed objections, and the NCUC issued a final order on 31 December 2008 ("Arbitration Order"), ruling on the objections and directing the parties to file interconnection agreements in accordance with the NCUC's rulings. Id. ¶ 35. The parties filed their conforming interconnection agreements on 20 February 2009, and the NCUC approved the agreements by order dated 24 February 2009. Id. ¶¶ 37-38.

Plaintiffs filed this action on 26 March 2009 pursuant to § 252(e)(6) of the Act, seeking review of several determinations made by the NCUC over the course of the proceedings and also seeking review of the NCUC's approval of portions of the interconnection agreements. Id. ¶ 1. Plaintiffs seek declaratory and injunctive relief, as well as compensation from the RLEC

defendants "for all sums paid during this appeal that exceed proper transport and termination rates consistent with federal law[.]" Id. at 24 (Prayer for Relief).

The plaintiffs, the RLEC defendants, and the NCUC all filed cross-motions for summary judgment on 16 November 2009.

## II. DISCUSSION

A.    Standard of Review

Under the . . . Act, the court is to "determine whether a state utility commission's arbitration decision 'meets the requirements' of [sections] 251 and 252 of the Act." GTE S., Inc. v. Morrison, 199 F.3d 733, 742 (4th Cir. 1999) (quoting 47 U.S.C. § 252(e)(6)). The Act, however, contains no particular standard of review. Id. at 745. In GTE South, the Fourth Circuit discussed a state commission's telecommunications arbitration decision and held that, "[a]bsent a statutory command, general standards of judicial review of agency action apply." Id. "Thus, [the court] review[s] de novo the [NCUC's] interpretations of the . . . Act." Id.; see BellSouth Telecomms., Inc. v. Sanford, 494 F.3d 439, 447-48 (4th Cir. 2007). As for factual findings, the "Act does not require [the court] to sit as a super public utilities commission." GTE S., Inc., 199 F.3d at 745. Rather, a state commission's findings of fact are reviewed under the substantial evidence standard. Id. The Fourth Circuit has described the substantial evidence standard as follows:

[S]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. While substantial evidence is more than a scintilla, it is also less than a preponderance. A court is not free to substitute its judgment for the agency's ...; it must uphold a decision that has substantial support in the record as a whole even if it might have decided differently as an original matter.

AT & T Wireless PCS, Inc. v. City Council of Va. Beach, 155 F.3d 423, 430 (4th Cir. 1998) (quotations omitted) (citations omitted).

Time Warner Cable Info. Servs. (N.C.), LLC v. Duncan, 656 F. Supp. 2d 565, 574-75 (E.D.N.C. 2009) (some alterations in original).[2]

_____

[2] Plaintiffs and the NCUC agree that the court reviews the NCUC's findings of fact under a substantial evidence standard of review. Mem. Supp. Pls.' Mot. Summ. J. at 9; Mem. Supp. NCUC's Mot. Summ. J. at 9. However, the RLEC defendants contend that "[w]ith respect to the NCUC's application of the pertinent facts to the underlying law,

(continued...)

3

B.    Compensation for Local Traffic Exchanged through Indirect Interconnection

Given the technical nature of this case, the court will provide a general explanation of some background concepts before proceeding to the merits of plaintiffs' first claim. When a telephone customer places a telephone call, the call will first go through the originating carrier's network. The call is completed on the terminating carrier's network. See Wisconsin Bell, Inc. v. Bie, 216 F. Supp. 2d 873, 876 (W.D. Wis. 2002) ("[I]f a customer of carrier A calls a customer of carrier B, the call originates on carrier A's equipment but terminates on carrier B's equipment.").

In some instances, the originating carrier and the terminating carrier are directly connected to one another. In other cases, such as this one, the carriers are indirectly connected by an intermediary third-party transit provider.[3] In this situation, when a customer of carrier A calls a customer of carrier B, the call originates on carrier A's equipment, but it is then delivered to the third-party transit provider. The third-party transit provider then delivers the call to carrier B, who delivers the call to the customer. A similar process occurs when a call is made by a customer of carrier B to a customer of carrier A. Here, the intermediary carrier between the CMRS providers and the RLEC defendants is typically plaintiff AT&T Mobility's affiliate,

_____

[2](...continued)
the arbitrary and capricious standard of review is to be applied." Mem. Supp. RLECs' Mot. Summ. J. at 7 (emphasis in original) (citing MCI Telecomms. Corp. v. BellSouth Telecomms., Inc., 112 F. Supp. 2d 1286, 1291 (N.D. Fla. 2000); AT&T Commc'ns of S. States, Inc. v. BellSouth Telecomms., Inc., 7 F. Supp. 2d 661, 668 (E.D.N.C. 1998) (Britt, J.)). The opinion in MCI Telecommunications is not binding on this court, and this court's decision in AT&T Communications of Southern States predates the Fourth Circuit's decision in AT&T Wireless by just over three months. Therefore, the court finds that application of the substantial evidence standard of review to the NCUC's factual determinations is appropriate. In any event, the Fourth Circuit has noted that "[w]ith respect to review of factfindings, there is no meaningful difference between [the arbitrary and capricious] standard and the substantial evidence standard . . . ." GTE S., Inc., 199 F.3d at 745 n.5.

[3] One reason why the CMRS providers and the RLEC defendants do not generally establish direct interconnection is because the relatively small amounts of traffic do not justify the costs. See Comp. ¶ 13; Ans. ¶ 13.

4

BellSouth Telecommunications, Inc., d/b/a AT&T North Carolina ("BellSouth/AT&T North Carolina"). See Compl. ¶ 15; Mem. Supp. NCUC's Mot. Summ. J. at 4.

Furthermore, it is important to note by way of background that federal regulations require the originating carrier of local traffic to compensate the terminating carrier for transport and termination costs. In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, 11 FCC Rcd. 15499, 16013 ¶ 1034 (1996) ("Local Competition Order"). For example, as stated previously, if a customer of carrier A calls a customer of carrier B, the call originates on carrier A's equipment but terminates on carrier B's equipment.

> Absent a reciprocal compensation arrangement, carrier A would charge its customer for the call, but carrier B would receive no compensation for the use of its equipment in terminating the call. In a reciprocal compensation regime, carrier A pays carrier B on a per minute basis for terminating the local call. This insures that both carriers are compensated for local intercarrier calls.

Wisconsin Bell, 216 F. Supp. 2d at 876. The originating carrier's obligation to pay for "transport" begins at the "interconnection point" between the two carriers. Local Competition Order, 11 FCC Rcd. at 16015 ¶ 1039.

Proceeding to the merits of this case, plaintiffs' first claim for relief[4] challenges the NCUC's resolution of Commission Issues 1 and 2 in the underlying arbitration proceedings. In

_____

[4] The NCUC contends that this claim "applies only to Plaintiff AT&T Mobility, and summary judgment must be granted on this claim as to the Plaintiff Alltel" because "Alltel resolved the . . . issue through negotiation and stipulation with the [R]LECs, not by determination in the NCUC's arbitration orders." Mem. Supp. NCUC's Mot. Summ. J. at 9 n.7. Plaintiffs contend that automatic summary judgment against Alltel is not appropriate because "'any party aggrieved' by a state commission's arbitration determination may seek review of that determination" under § 252(e)(6) of the Act, and "there is no requirement that a party raise an issue in an arbitration in order to challenge the state commission's resolution of that issue." Pls.' Mem. Opp'n Defs.' Mots. Summ. J. at 6 n.17 (citing MCI Telecomms. Corp. v. BellSouth Telecomms. Corp., 7 F. Supp. 2d 674, 680 (E.D.N.C. 1998) (Britt, J.) (Addressing an issue regarding the interpretation of the Act on its merits because "[t]o hold otherwise would be to rely on an exhaustion of state remedies argument which does not seem to apply here, where Congress has devised an entirely new scheme.")). The court finds that it is appropriate to consider the claim as to both plaintiffs.

Commission Issue 1, the NCUC held that there should be only one point of interconnection

("POI") in the indirect interconnections present in this case, and that the POI "should be located

on the RLECs' network."[5]  Arbitration Order at 11.  As part of this holding, the NCUC also

found that the third-party transit network is considered to be "a virtual part of the CMRS

Providers' network."  Id. at 13.  Based on its findings in Issue 1, the NCUC concluded in

Commission Issue 2 that:

> "[t]he RLECs are technically and financially responsible for transporting and
> delivering their originating traffic to the chosen POI and for paying reciprocal
> compensation to cover the cost of terminating and completing the call beyond the
> POI, but they are not responsible for transit charges, based on the CMRS
> Providers' use of a third-party provider's network facilities, beyond the POI . . . ."

Id. at 23 (quoting RAO at 24-25).  Thus, the NCUC held that the CMRS providers are

responsible for paying the transit costs for RLEC-originated traffic.

The NCUC also held that the CMRS providers could seek reimbursement of the transit

charges from the originating carrier through reciprocal compensation.  Id. at 14, 21.  The NCUC

further explained that:

> if any carrier believes that the reciprocal compensation rate does not adequately
> capture all relevant call termination costs such that it does not receive adequate
> compensation through payment of the symmetrical compensation rate, that carrier
> may petition the Commission to establish an asymmetrical reciprocal
> compensation rate which will allow the carrier to fully recover its costs of
> terminating a particular call.

Id. at 21.

A brief explanation of the procedural background of this case will be helpful in

---

[5] As part of the 20 December 2007 RAO, the NCUC directed the CMRS Providers to select the POI at a
location on the RLECs' networks.  RAO at 18.  The NCUC affirmed this decision in the Arbitration Order.  Arbitration
Order at 1, 14.

understanding the legal questions presented here. In the underlying arbitration proceedings, there was no dispute that in a case of direct interconnection, there is only one POI, which is located where the direct interconnection facility of the CMRS provider meets the direct interconnection facility of the RLEC. RAO at 13. However, in a case such as this one where the parties are connected indirectly, the CMRS providers argued that there are two POIs: (1) the point of interconnection between the RLEC and the transit provider, and (2) the point of interconnection between the CMRS Provider and the transit provider. Id. For their part, the RLEC defendants argued that when interconnection is indirect, there should be only one POI, regardless of which party originates the call. The RLEC defendants maintained that this single POI should be located at the place where the RLEC network connects to the network of the transit provider. Id.

In its initial 20 December 2007 RAO, the NCUC ruled that there was only one POI between the CMRS Providers and the RLECs and that this POI was located on the RLECs' network. The NCUC based its determination on § 251(c)(2) of the Act, which provides that an incumbent LEC (such as the RLECs in this case) must provide physical interconnection at a point on its own network upon request. Id. at 17.

However, in its final Arbitration Order, the NCUC ultimately found that § 251(c)(2) was not in fact determinative of the number of POI(s) or their location. Arbitration Order at 10-11. The NCUC found that, on its face, the duty under § 251(c)(2) extends only to incumbent LECs and is triggered only upon request.[6] In this case, because the RLEC defendants were the ones

---

[6] 47 U.S.C. § 251(c)(2)(B) provides: "In addition to the duties contained in subsection (b) of this section, each incumbent local exchange carrier has the following duties: . . . (2) The duty to provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the local exchange carrier's network – . . . (B) at any

(continued...)

who requested interconnection, the CMRS providers could not be considered to be the "requesting telecommunications carrier" pursuant to § 251(c)(2). Id. As a result, the duty of the RLECs under this section was never triggered, thereby rendering the provision inapplicable to the parties in the instant case. Id.

As a result of this ruling, the NCUC determined that the only basis for interconnection in this case is provided by § 251(a)(1) of the Act, which states that "[e]ach telecommunications carrier has the duty . . . to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers . . . ." Unlike the language of § 251(c)(2) which specifies a single POI on the network of an incumbent LEC, § 251(a)(1) does not specify the number or the location of the POI(s). In fact, this section fails to provide any direction to guide carriers on establishing either a direct or indirect connection. Because of this, the NCUC determined that it was required to define the parties' POI(s) and award compensation as appropriate. Arbitration Order at 11-12.

In its final Arbitration Order, the NCUC reaffirmed the determinations that it made in the RAO, finding that there was just one POI on the RLECs' network and that the RLECs were financially responsible for delivering their originating traffic to the chosen POI and for paying reciprocal compensation to the terminating carrier thereafter. Id. at 14, 23.

The NCUC based its decision in part on certain "equities" that it found present in this situation:

> First, there are the relative sizes of the CMRS Providers and the RLECs. The RLECs in these dockets are small, rural telephone companies with limited service areas, while the CMRS Providers are massive entities whose local calling areas,

---

[6](...continued)
technically feasible point within the carrier's network." (emphasis added).

or MTAs, sprawl across states.  As such, the CMRS Providers' network can, with only slight exaggeration, be called ubiquitous, while those of the RLECs are small and local.  Under that set of circumstances, it is more equitable for there to be a single POI that is located on the RLECs' networks.

Second, the use of a single POI places these RLECs, practically speaking, in the same position as they would have been had they been able to rely on Section 251(c)(2). . . .

Third, the use of a single point in the circumstances of these dockets is conceptually less complicated than the use of multiple POIs. . . .

Id. at 13.

The following diagram illustrates the NCUC's conclusion regarding the location of the

POI:



Test. Jean Thaxton, DE # 75-66 at 3:151-153.

Proceeding to the merits of this claim, the court agrees with the determination made by

the NCUC in its final Arbitration Order that § 251(a)(1) of the Act provides the only basis for the

indirect interconnections present in this case.  The court also agrees that this section of the Act is

silent regarding the terms and conditions of indirect interconnections.  The court now turns to the

plaintiffs' arguments regarding the location of the POI(s) and the determination of financial

responsibility for transit costs.

The CMRS providers vigorously dispute the NCUC's findings that there should be just

one POI in this case and that the CMRS providers should be required to pay the transit charges

incurred for traffic originated by the RLEC defendants.  Plaintiffs argue that "the CMRS

Providers and the RLECs are indirectly interconnected through the network of a transit provider,

an arrangement that necessarily produces at least <u>two</u> points of interconnection." Mem. Supp. Pls.' Mot. Summ. J. at 14 (emphasis in original). As a result, plaintiffs claim, the RLECs are responsible for paying the costs for calls that originate on the RLECs' networks up to the POI on the networks of the CMRS providers, which would necessarily include the transit costs. <u>See</u> Arbitration Order at 18 (discussing plaintiffs' argument).

In support of these contentions, plaintiffs rely on <u>Atlas Tel. Co. v. Okla. Corp. Comm'n</u>, 400 F.3d 1256 (10th Cir. 2005), which they claim is "factually indistinguishable" from the present case. Mem. Supp. Pls.' Mot. Summ. J. at 10 n.40. Because plaintiffs rely so heavily on this case, a detailed discussion of the <u>Atlas</u> decision is necessary. On its face, the situation present in <u>Atlas</u> does have some similarities to the instant case. Like this case, <u>Atlas</u> involved a dispute between CMRS providers and LECs regarding the appropriate means to handle compensation for the third-party transferred calls that occurred in the same major trading area.[7]

However, this is where the similarities end. In <u>Atlas</u>, the LECs maintained a very different argument from that made by the RLEC defendants in this case. The LECs in <u>Atlas</u> argued that traffic passing through a third-party carrier was subject to the access charge, or long-distance calling, regime. Pursuant to this regime, the originating caller pays the third-party carrier, which in turn compensates the originating and terminating networks. <u>Atlas</u>, 400 F.3d at 1260 (citing <u>Local Competition Order</u>, 11 FCC Rcd. at 16013 ¶ 1034). Under this scenario, neither the originating nor the terminating carrier bears the cost of transporting traffic on the third-party network. <u>Id.</u> at 1261. As a result, the LECs contended that they had no obligation to

---

[7] "A major trading area ('MTA') is the largest FCC-authorized wireless license territory, and might encompass all or part of numerous state-defined local calling areas." <u>Atlas</u>, 400 F.3d at 1261 (citing <u>Local Competition Order</u>, 11 FCC Rcd. at 16014 ¶ 1036). In this case, the calls at issue originate and terminate within the same MTA. <u>See</u>, <u>e.g.</u>, Arbitration Order at 19; RAO at 15, 18.

compensate the CMRS providers for transporting and terminating such traffic. The CMRS providers maintained that, regardless of the presence of the third-party carrier, the telecommunications exchange was subject to the reciprocal compensation obligations found in § 251(b)(5) of the Act. Id. at 1260.

The Tenth Circuit affirmed the determination made by the Oklahoma Corporation Commission "'that reciprocal compensation obligations apply to all calls originated by an [LEC] and terminated by a wireless provider within the same major trading area, without regard to whether those calls are delivered via an intermediate carrier.'" Id. at 1261 (quoting Atlas Tel. Co. v. Corp. Comm'n of Okla., 309 F. Supp. 2d 1299, 1310 (W.D. Okla. 2004)).

The holding in Atlas is simply not controlling here. The RLEC defendants have never argued that the long-distance calling regime should be applied in this case, nor do they argue that the Act's reciprocal compensation obligations are inapplicable to calls that they originate. In fact, the RLEC defendants have gone so far as to say that they "agree with the conclusion reached by the Atlas decision[] . . . ." Mem. Supp. RLECs' Mot. Summ. J. at 13. See also RLECs' Mem. Resp. Pls.' Mot. Summ. J. at 10.

Despite the significant differences between the holding in Atlas and the circumstances found in the instant case, plaintiffs argue that certain findings made by the Tenth Circuit in Atlas bear directly on the issues presented here. Plaintiffs rely specifically on two passages in Atlas to support their argument. See, e.g., Mem. Supp. Pls.' Mot. Summ. J. at 10 n.40; 13 n.48; 14; 16-17. The first passage is contained in the "Background" section of the opinion, and plaintiffs claim that it supports their position that two POIs must be found in this case:

> When an [LEC] customer places a call to a CMRS customer, the call must first
> pass from the [LEC] network through a point of interconnection with the [third-

11

party provider's] network. [The third-party provider] then routes the call to a second point of interconnection between its network and the CMRS network. The call is then delivered to the CMRS customer. In contrast, were the [LEC] and CMRS networks directly connected, the call would pass only through a single point of interconnection.

Atlas, 400 F.3d at 1260.

Here, the court agrees with the RLEC defendants' statement that the plaintiffs are trying to "cherry-pick specific language" that bolsters their position. Mem. Supp. RLECs' Mot. Summ. J. at 15 n.22. See also RLECs' Mem. Reply Pls.' Opp'n Defs.' Mots. Summ. J. at 3. It is clear that the language in this passage is provided merely as background information. Neither the establishment of the location of the POI(s) nor the financial responsibility for transit costs was at issue in Atlas. Furthermore, the Tenth Circuit's narrative regarding the existence of two POIs was in no way integral to the analytical foundations of the court's ultimate holding that reciprocal compensation obligations apply to all traffic exchanged between an LEC and a CMRS provider in the same major trading area, even if the calls go through a third-party carrier. Thus, the language that plaintiffs rely on is dictum and is not binding on this court. See Pittston Co. v. United States, 199 F.3d 694, 703 (4th Cir. 1999) ("Dictum is 'statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding - that, being peripheral, may not have received the full and careful consideration of the court that uttered it.'" (quoting United States v. Crawley, 837 F.2d 291, 292 (7th Cir. 1988))); Patel v. Sun Co., Inc., 141 F.3d 447, 462 & n.11 (3rd Cir. 1998).

The second passage on which plaintiffs rely is found in footnote 11 of the Atlas opinion, and plaintiffs claim that it supports their argument that they cannot be held responsible for the payment of the transit charges in this case:

12

> Because we hold that 47 U.S.C. § 251(c)(2) does not govern interconnection for the purposes of local exchange traffic, the [LECs'] argument that CMRS providers must bear the expense of transporting [LEC]-originated traffic on the [intermediary] network must fail.

Atlas, 400 F.3d at 1266 n.11.

For the same reasons stated above, the statement contained in this footnote is dictum, and the court gives no weight to this passage. Moreover, plaintiffs' reliance on this language is misplaced. The fundamental flaw in plaintiffs' argument with respect to this passage is that they overlook the fact that the LECs in Atlas were attempting to completely avoid responsibility for paying for the transport of third-party traffic that originated on their networks. In other words, they argued that they had to pay absolutely nothing for the transport of the third-party traffic.

Here, the NCUC has only required the CMRS providers to bear the transit charges initially. Arbitration Order at 14. The RLEC defendants acknowledge that the CMRS providers are entitled to be reimbursed for any transit charges paid in connection with the termination of RLEC-originated calls in the form of reciprocal compensation paid by the RLECs. RLECs' Mem. Resp. Pls.' Mot. Summ. J. at 6 n.1. Unlike the situation in Atlas, the RLEC defendants are not attempting to entirely avoid responsibility for paying the transit charges at issue in this case. Thus, the court finds that the Atlas opinion does not provide a basis for overturning the NCUC's resolution of Commission Issues 1 and 2.[8]

---

[8] The plaintiffs also point out that the Tenth Circuit's opinion in Atlas involved two District Court decisions, which they label as "Atlas I" and "Atlas II." Pls.' Mem. Opp'n Defs.' Mots. Summ. J. at 10. Plaintiffs argue that Atlas II presents "the same issue raised in this case . . . ." Id. at 10-11 (emphasis in original). Plaintiffs base this assertion on the fact that the LECs in that case contended that "the Commission erred in the proceedings below because '[t]he [Oklahoma Corporation Commission's] Order and The Agreement[ ] Impermissibly Require the [LECs] to Pay for the Transport of Traffic to a Point Outside Their Networks.'" Id. at 10 (quoting Atlas Tel. Co. v. Corp. Comm'n of Okla., 309 F. Supp.2d 1313, 1314 (W.D. Okla. 2004)) (alterations in original) (quoting another source) (internal quotation marks omitted).

Again, plaintiffs are singling out specific language that appears to bolster their argument. The court notes that
(continued...)

Furthermore, even if the court were to accept plaintiffs' argument that the decision in Atlas requires the establishment of two physical POIs, this finding would not necessitate the reversal of the NCUC's decision that plaintiffs are responsible for paying the transit costs for RLEC-originated traffic. The term "point of interconnection" is not specifically defined in the Act or in the regulations promulgated under the Act, and none of the parties dispute this. Although the most obvious meaning of this term is the physical point at which two carriers' networks meet, the term has also taken on financial connotations, so that the physical point of interconnection has sometimes been conflated with the billing point.[9]

However, the Federal Communications Commission ("FCC") has pointed out that a distinction can be made "between the physical POI and the point at which [the parties] are responsible for the cost of interconnection facilities." In Re Application of Verizon Pennsylvania Inc., et al. For Authorization To Provide In-Region, InterLATA Services In Pennsylvania, 16 FCC Rcd. 17419, 17474 ¶ 100 (2001) ("In Re Verizon Pa., Inc."). See also In Re Application of Verizon Maryland Inc., et al. For Authorization To Provide In-Region,

---

[8](...continued)
the Tenth Circuit disposed of the Atlas II case in a mere two-paragraph analysis. In its discussion, the Tenth Circuit characterized the issue presented in Atlas II as whether the Act "requires competing carriers to establish a physical connection within an [ ]LEC's network for the exchange of local traffic." Atlas, 400 F.3d at 1268 (emphasis in original). The court went on to explain that the LECs interpreted the Act as "imposing a requirement of direct connection on a competing carrier." Id. The Tenth Circuit disagreed with the LECs' argument and found that the LECs' obligation to establish reciprocal compensation arrangements with the CMRS provider "is not impacted by the presence or absence of a direct connection." Id. As with the other passages cited by plaintiffs, this analysis has no bearing on the issue of establishing the location of the POI(s) or on the issue of financial responsibility for transit costs, and it is not controlling here.

[9] In fact, this is exactly what seems to have happened in this case. In the Arbitration Order, the NCUC found that "[t]he parties agree, either explicitly or implicitly, that the 'determination of where the POI is located in the cases of indirect interconnection, in effect, determines which carrier pays the transit charge for landline originated traffic' in the first instance." Arbitration Order at 18 (quoting CMRS' Providers Post-Hearing Br. at 6). See also RLECs' Mem. Resp. Pls.' Mot. Summ. J. at 11 n.8 ("In the present case, the parties agree that the definition of the POI does in fact allocate both technical and financial responsibilities between the parties.").

InterLATA Services In Maryland, Washington, D.C., and West Virginia, 18 FCC Rcd. 5212,

5273 ¶ 103 (2003) (noting that the carrier defined the interconnection point (IP), which

determined financial responsibility for inter-network calls, as a particular switch even if the

physical point of interconnection (POI) was different, such as a mid-span meet point[10] ).  In the

same order, the FCC further notes that "[t]he issue of allocation of financial responsibility for

interconnection facilities is an open issue . . . ."  In Re Verizon Pa. Inc., 16 FCC Rcd. at 17474 ¶

100 (emphasis added).  See also Iowa Telecomms. Servs., Inc. v. Iowa Utils. Bd., No.

4:07cv0032 JAJ, 2009 WL 1674284 at * 10 (S.D. Iowa June 12, 2009) ("The point of financial

responsibility may be, but does not have to be, the same point as the point of physical

interconnection."); T-Mobile USA, Inc. v. Armstrong, No. 3:08-36-DCR, 2009 WL 1424044 at

*4 (E.D. Ky. May 20, 2009) (provisions of the Act cited by RLECs and the Commission did not

contain "any mention of financial obligations that accompany the designation of a physical point

of interconnection").  As a result, it was not improper for the NCUC to conclude that there was

just one POI for the purposes of allocating financial responsibility for the transit costs in this

case.[11]

---

[10] The court notes that under 47 C.F.R. § 51.5, the term "meet point" has been defined as "a point of interconnection between two networks, designated by two telecommunications carriers, at which one carrier's responsibility for service begins and the other carrier's responsibility ends."

[11] The court also finds the following language from the FCC to be particularly instructive:
[I]ssues related to the location of the POI and the allocation of transport costs are some of the most contentious issues in interconnection proceedings.  In particular, the record suggests that there are a substantial number of disputes related to how carriers should allocate interconnection costs, particularly when the physical POI is located outside the local calling area where the call originates or when carriers are indirectly interconnected.  These disputes arise in part because of a lack of clarity among the various rules governing the costs of interconnection facilities and the relationship of those rules to the single POI rule.
In the Matter of Developing a Unified Intercarrier Compensation Regime, 20 FCC Rcd. 4685, 4727-28 ¶ 91 (2005) (emphases added) (footnotes omitted).  Although this passage appears to relate specifically to § 251(c)(2) of the Act and that section's "single POI rule," which does not apply to this case, the language is still extremely informative regarding
(continued...)

Next, plaintiffs argue that the NCUC's determination regarding their responsibility for paying the transit costs for RLEC-originated traffic is prohibited by the regulations promulgated under the Act. Plaintiffs rely specifically on 47 C.F.R. § 51.703(b), which provides that "[a] LEC may not assess charges on any other telecommunications carrier for telecommunications traffic that originates on the LEC's network."[12] Plaintiffs also cite to case law in support of this argument. See MCIMetro Access Transmission Servs., Inc. v. BellSouth Telecomms., Inc., 352 F.3d 872, 881 (4th Cir. 2003) ("Rule 703(b) is unequivocal in prohibiting LECs from levying charges for traffic originating on their own networks, and, by its own terms, admits of no exceptions."); T-Mobile, 2009 WL 142044 at *6 ("[R]egardless of the location of the interconnection point, the RLECs may not charge the Wireless Carriers for transport costs on RLEC-originated calls.").

Despite plaintiffs' arguments to the contrary, 47 C.F.R. § 51.703(b) is not applicable to this case because the transit charges in dispute are not charges that are assessed by the RLEC defendants. Rather, the transit charges are assessed by a third-party carrier, such as BellSouth/AT&T North Carolina. See Test. Jean Thaxton, DE # 75-66 at 7:257-259 ("The charges in dispute . . . are transit charges assessed by BellSouth (not the originating RLEC) for BellSouth's provision of facilities between the RLEC POI and the CMRS end office

---

[11](...continued)
the lack of clarity surrounding the location of POI(s) and the allocation of transport costs.

[12] Plaintiffs further argue that the "combined effect" of 47 C.F.R. § 51.703(b) and 47 C.F.R. § 51.701(b)(2) requires the RLEC defendants "'to deliver without charge, traffic to CMRS providers anywhere within the MTA in which the call originated.'" Pls.' Mem. Opp'n Defs.' Mots. Summ. J. at 9 (citing TSR Wireless, LLC v. US West Commc'ns., Inc., 15 FCC Rcd. 11166, 11184 ¶ 31 (2000)). Section 51.701(b)(2) defines "telecommunications traffic" as "traffic exchanged between a LEC and a CMRS provider, that, at the beginning of the call, originates and terminates within the same Major Trading Area . . . ." 47 C.F.R. § 51.701(b)(2). The court has considered this additional regulation, and it does not alter the court's conclusion with respect to this issue.

equivalent."). The FCC has explained the concept of transiting and how transit charges are paid:

> Transiting occurs when two carriers that are not directly interconnected exchange non-access traffic by routing the traffic through an intermediary carrier's network. Typically, the intermediary carrier is an incumbent LEC and the transited traffic is routed from the originating carrier through the incumbent LEC's tandem switch to the terminating carrier. <u>The intermediary (transiting) carrier then charges a fee for use of its facilities.</u>

<u>In the Matter of Developing a Unified Intercarrier Compensation Regime</u>, 20 FCC Rcd. at 4737 ¶ 120 (emphasis added).

Furthermore, the fees that are being charged here are not ultimately "assessed" against the CMRS providers. Although the NCUC held that the CMRS providers must initially pay the transit charges for RLEC-originated traffic, the NCUC also held that the CMRS providers will ultimately recover their transport and termination costs, including any transit charges, through reciprocal compensation paid by the RLEC defendants. Arbitration Order at 14, 21. If plaintiffs find that the reciprocal compensation rate does not adequately reimburse them for the transit costs, they can petition the NCUC for an asymmetrical compensation rate. <u>Id.</u>

The FCC has addressed this issue and has stated that a third-party carrier is typically compensated by the terminating carrier. The FCC has specifically explained that a third-party transit provider "may charge a terminating carrier for the portion of facilities used to deliver transiting traffic to the terminating carrier[,]" and the terminating carrier "may seek reimbursement of these costs from originating carriers through reciprocal compensation."[13] <u>Texcom, Inc. v. Bell Atl. Corp.</u>, 17 FCC Rcd. 6275, 6277 ¶ 4 (2002). While carriers are free to negotiate different arrangements for the costs of indirect connection, such costs are typically

---

[13] This explanation by the FCC puts to rest plaintiffs' contention that "charges for [transit] services <u>cannot</u> under federal law be recovered through reciprocal compensation rates." Pls.' Mem. Opp'n Defs.' Mots. Summ. J. at 12 (emphasis in original). <u>See also</u> Mem. Supp. Pls.' Mot. Summ. J. at 20.

recovered through reciprocal compensation.  Id. at n.12.  Here, the court agrees with the NCUC's assessment that plaintiffs "ignore[] the provision that is made for recovery of the transit costs through reciprocal compensation."  NCUC's Resp. Mots. Summ. J. at 8 (emphasis in original).

The cases cited by plaintiffs regarding the application of 47 C.F.R. § 51.703(b) are also distinguishable.  In T-Mobile, 2009 WL 1424044 at *4, the RLECs argued that they were responsible for the cost of transporting their originating calls up to the interconnection point they had negotiated and that they had no further responsibility thereafter.  Here, the RLEC defendants will compensate the CMRS providers through reciprocal compensation, a result which is consistent with the ultimate holding in T-Mobile.

In MCIMetro Access Transmission Servs., Inc., 352 F.3d at 877, MCIMetro decided to interconnect with BellSouth's network at only one point in the North Carolina local access and transport area through a single switch.  As a result, all traffic had to pass through that POI, regardless of the location of the two customers.  Id.  BellSouth incurred greater costs for transporting routine local traffic because of MCIMetro's decision regarding the location of the POI.  Id.  In order to resolve this perceived inequity, BellSouth agreed to pay for transporting calls to the edge of the local calling area without charge.  Id. at n.2.  BellSouth then argued that MCIMetro should pay the incremental cost of transporting the call the additional distance from the edge of the local calling area to the POI.  Id.  Thus, BellSouth was attempting to directly assess charges against MCIMetro for transporting calls within its own network, i.e. before the calls got to the POI.  In contrast, the charges in this case are being assessed by the transit carrier, not by the RLECs.  Furthermore, any charges incurred by the CMRS providers in this case do not occur until the traffic leaves the RLECs' networks.  Thus, the court concludes that 47 C.F.R.

18

§ 51.703(b) does not apply to this case and does not require the reversal of the NCUC's

resolution of Commission Issues 1 and 2.

Plaintiffs' next argument involves the following findings made by the NCUC:

[T]he CMRS Providers are entitled to be reimbursed for any transit charges paid
in connection with the termination of RLEC-originated calls in the form of
reciprocal compensation paid by the RLEC. Any genuine financial disadvantage
that may inure to the CMRS Providers from there being a single POI located on
the RLEC's network is curable by a proceeding to arrive at an asymmetric
reciprocal compensation rate. As noted elsewhere, the reciprocal compensation
rate is deemed to include any transit costs, but those costs are not necessarily
separately identified. To the extent that this structure creates significant financial
undercompensation for the CMRS Provider, this problem can be corrected if there is a
proceeding to determine an asymmetrical rate; but, for that to occur, the CMRS Providers
will have to request the establishment of an asymmetric reciprocal compensation rate and
furnish to[sic] the relevant cost data to the Commission.

Arbitration Order at 14. See also Arbitration Order at 22-23; Mem. Supp. Pls.' Mot. Summ. J. at

19.

Plaintiffs argue that these findings are "[f]orcing" them to seek reimbursement through

asymmetrical compensation rates, which they claim is inconsistent with federal law. Mem.

Supp. Pls.' Mot. Summ. J. at 19. See also Pls.' Reply Mem. Supp. Mot. Summ. J. at 5. In

explaining this argument, plaintiffs state:

Under the agreements mandated by the NCUC's decision, the reciprocal
compensation received by a CMRS Provider for terminating each RLEC-
originated call is partially offset by the transit charge paid by the CMRS Provider
to the intermediate, third-party carrier for delivering that call to the CMRS
Provider. Thus, the net effect of the NCUC's cost-shifting is to impose
asymmetrical reciprocal compensation rates, in direct violation of 47 C.F.R. §
51.711(a)(1).

Mem. Supp. Pls.' Mot. Summ. J. at 21 (emphasis in original).

Plaintiffs' argument is without merit. Pursuant to 47 C.F.R. § 51.711(a)(1),[14] reciprocal compensation is based on the RLECs' cost of terminating a minute of CMRS-originated traffic. The reciprocal compensation rate is not in any way based on plaintiffs' cost of terminating a minute of RLEC-originated traffic. Because the compensation is "reciprocal," each carrier pays the other the same amount for terminating a minute of traffic. Thus, the fact that the costs incurred by the RLEC defendants and the CMRS providers may be very different is not a factor that is considered in determining the reciprocal compensation rate.

Furthermore, contrary to plaintiffs' assertions, it is not necessarily true that the symmetrical compensation rate would provide insufficient reimbursement for any transit costs incurred by plaintiffs. Because the symmetrical reciprocal compensation rate is based on the RLECs' cost of terminating a minute of CMRS-originated traffic, there is no evidence available as to what plaintiffs' costs of termination are in this case. As the RLEC defendants point out, "the economies of scale and resultant lower costs that [large] carrier[s] such as [plaintiffs] would enjoy, could reasonably be expected to be considerably more favorable than the costs incurred by the RLECs." RLECs' Mem. Resp. Pls.' Mot. Summ. J. at 23. Thus, it is possible that the plaintiffs could recover transit costs in the reciprocal compensation rate. However, again, if plaintiffs believe that they are not being fairly compensated through the reciprocal compensation rate, they can voluntarily seek an asymmetrical compensation rate from the NCUC. As a result, the court concludes that plaintiffs are not being forced to seek reimbursement through an asymmetrical compensation rate.

_____

[14] 47 C.F.R. § 51.711(a)(1) provides: "For purposes of this subpart, symmetrical rates are rates that a carrier other than an incumbent LEC assesses upon an incumbent LEC for transport and termination of telecommunications traffic equal to those that the incumbent LEC assesses upon the other carrier for the same services."

Plaintiffs also argue that the NCUC's rulings on Commission Issues 1 and 2 "impermissibly obstruct Congress's goals of promoting competition and consumer choice in telecommunications services."  Mem. Supp. Pls.' Mot. Summ. J. at 12.  The court acknowledges that one of the fundamental purposes of the Act is to promote competition within the telecommunications industry.  See, e.g., MCI Telecomms. Corp. v. BellSouth Telecomms., Inc., 40 F. Supp. 2d 416, 424 (E.D. Ky. 1999) ("The purpose of the Act is to create a vibrant competitive market that will bring lower prices and better service to consumers."); AT&T Commc'ns of S. States, Inc. v. BellSouth Telecomms., Inc., 7 F. Supp. 2d 661, 663 (E.D.N.C. 1998).  However, as the NCUC determined, the equities found in this situation support the result reached in this case.[15]  Here, as noted previously, the NCUC concluded that:

> [t]he RLECs in these dockets are small, rural telephone companies with limited service areas, while the CMRS Providers are massive entities whose local calling areas, or MTAs, sprawl across states.  As such, the CMRS Providers' network can, with only slight exaggeration, be called ubiquitous, while those of the RLECs are small and local.  Under that set of circumstances, it is more equitable for there to be a single POI that is located on the RLECs' networks.

Arbitration Order at 13.

The court cannot disagree with this conclusion.  The size of the RLEC defendants' networks is undisputed by the plaintiffs.  As of April 2007, Ellerbe Telephone Company served about 2,200 customers.  See Test. Herbert Long, DE # 75-86 at 5:14.  MebTel served about 15,000 customers at that time.  See Test. Michael T. Skrivan, DE # 75-70 at 11:3-4.  Randolph served about 4,600 customers, and the number of the company's access lines has been declining in recent years.  See Test. Jean Thaxton, DE # 75-65 at 6:21-22.  Given the fact that the Act does

---

[15] The NCUC also noted that "[b]y the same token, the equities in other cases may call for a different result." Arbitration Order at 12.

not provide any direction regarding the establishment of the location of the POI(s) or regarding the parties' financial responsibility for transit costs, it was not wrong for NCUC to consider these circumstances in rendering its decision.

Furthermore, because plaintiff AT&T's affiliate, BellSouth/AT&T North Carolina, is typically the third-party transit provider between plaintiffs and the RLEC defendants, BellSouth/AT&T North Carolina would receive transit fees for the same traffic for which plaintiffs would be reimbursed through reciprocal compensation. Under these circumstances, the NCUC found that the initial imposition of transit charges on the RLECs would not be appropriate or consistent with federal requirements. See Arbitration Order at 22; Mem. Supp. NCUC's Mot. Summ. J. at 16.[16]

In summary, the Act and its accompanying regulations provide very little guidance regarding the terms of indirect interconnections. There is nothing in the Act that mandates the number or location of the POI(s). Furthermore, the Act does not address the issue of allocation of financial responsibility for interconnection costs. Without clearer direction from Congress or the FCC on these issues, the court cannot say that the NCUC's determinations with regard to Commission Issues 1 and 2 were in error. Thus, the court concludes that these decisions meet the requirements of §§ 251 and 252 of the Act. See GTE S., Inc. v. Morrison, 199 F.3d

---

[16] One of the other equities considered by the NCUC was that "the use of a single POI places these RLECs, practically speaking, in the same position as they would have been able had they been able to rely on Section 251(c)(2)." Arbitration Order at 13. The NCUC asserted that a single POI was required to ensure that the RLECs are not "disadvantaged" by their inability to obtain direct interconnection pursuant to § 251(c)(2). Id. Plaintiffs claim that the NCUC improperly protected the RLECs from the economic consequences of indirect interconnection. See Mem. Supp. Pls.' Mot. Summ. J. at 17. In support of their argument, plaintiffs cite to WWC License, L.L.C. v. Boyle, 459 F.3d 880, 892 (8th Cir. 2006) ("Nothing in the Act suggests that Congress intended a carrier's duties to be altered based on the carrier's election to connect indirectly rather than directly."). Assuming without deciding that plaintiffs are correct with respect to this particular point, the other reasons articulated by the NCUC regarding the equities present in this situation provide a sufficient basis to sustain the NCUC's decision.

733, 742 (4th Cir. 1999).

C.     Authority to Modify TELRIC Guidelines

In plaintiffs' second claim for relief, they challenge the NCUC's authority to allow the RLEC defendants' reciprocal compensation rates to be established based on a methodology other than Total Element Long Run Incremental Cost ("TELRIC"). Section 251(b)(5) of the Act imposes a "duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications" on all local exchange carriers. 47 U.S.C. § 251(b)(5). Section 252(d) of the Act establishes the pricing standards for reciprocal compensation arrangements. More specifically, reciprocal compensation rates must "provide for the mutual and reciprocal recovery by each carrier of costs associated with the transport and termination on each carrier's network facilities of calls that originate on the network facilities of the other carrier" with such costs being determined "on the basis of a reasonable approximation of the additional costs of terminating such calls." 47 U.S.C. § 252(d)(2)(A)(I)-(ii).

Under the regulations implementing § 252(d)(2), the FCC requires an incumbent LEC's rates for transport and termination of telecommunications traffic to be established on the basis of the "forward-looking economic costs of such offerings, using a cost study pursuant to [47 C.F.R.] §§ 51.505 and 51.511." 47 C.F.R. § 51.705(a)(1). The required cost study measures the "total element long-run incremental cost" of transport and termination. 47 C.F.R. § 51.505(a). The TELRIC should be measured "based on the use of the most efficient telecommunications technology currently available and the lowest cost network configuration, given the existing location of the incumbent LEC's wire centers." 47 C.F.R. § 51.505(b)(1). See also AT&T Corp. v. F.C.C., 220 F.3d 607, 615 (D.C. Cir. 2000) ("A forward-looking methodology, TELRIC bases

23

rates on the 'cost of operating a hypothetical network built with the most efficient technology

available.'" (quoting AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 374 n.3 (1999))).  In

addition, the reciprocal compensation rate may include "[a] reasonable allocation of forward-

looking common costs . . . ."  47 U.S.C. § 51.505(a)(2).

In this case, the RLEC defendants filed a petition with the NCUC and requested that the

NCUC "modify the requirements of § 251(b)(5), to the extent that either that statute or any FCC

implementing regulation associated with it, is interpreted to require the [RLECs] to provide

forward-looking TELRIC studies."  RLECs' Mem. Resp. Pls.' Mot. Summ. J. at 17 (citation

omitted) (internal quotation marks omitted).  In an order dated 8 March 2006 ("Modification

Order"), the NCUC determined that the RLEC defendants were not required to perform TELRIC

studies to establish reciprocal compensation rates.  Modification Order at 13.[17]  The NCUC

modified the TELRIC requirements and set out seven guidelines that the RLECs were to follow

when performing cost studies to set reciprocal compensation rates:

> 1.  The cost data should be easily obtainable, verifiable, and reflect only the direct
> costs associated with the transport and termination of traffic.
> 2.  The cost data may be a surrogate of the company's cost, but should be forward
> looking and reflect an efficient network to the extent practicable.
> 3.  The rates for transport and termination of traffic should be usage based.
> 4.  The capital costs and structure should reflect the cost and structure approved
> by the Commission in previous decisions in Docket No. P-100, Sub 133d.
> 5.  Depreciation should reflect the economic lives and net salvage values within
> the ranges established by the FCC.
> 6.  The study should include a reasonable allocation of common costs to be added
> to direct costs.
> 7.  The study should not include retail costs, opportunity costs, or revenues to

---

[17] The NCUC provided three reasons for its decision to allow the modification: "(1) the [RLECs] are local exchange carriers with fewer than 2% of the Nation's subscriber lines installed in the aggregate nationwide, (2) such TELRIC studies would be unduly economically burdensome to them, and (3) the granting of such relief would be consistent with the public interest, convenience and necessity."  Modification Order at 13 (internal quotation marks omitted).

subsidize other services.

Modification Order at 6. The NCUC affirmed this decision in the final Arbitration Order.

Arbitration Order at 27. As a result, the reciprocal compensation rates approved by the NCUC

were not based on TELRIC studies but were based instead on alternative cost studies prepared

pursuant to the NCUC guidelines set forth in the Modification Order.

As an initial matter, the RLEC defendants question plaintiffs' ability to challenge this

issue. The CMRS providers did not appeal the NCUC's Modification Order at the time that it

was entered. Therefore, the RLEC defendants claim that plaintiffs are now barred from raising

the issue based on the doctrine of *res judicata*. Plaintiffs dispute this contention, arguing that the

doctrine of *res judicata* does not apply to state commission determinations relating to local

interconnection under the Act.

The court agrees with plaintiffs and finds that the doctrine of *res judicata* is not

applicable here. In the interpretation of a federal statute, "the question is not whether

administrative estoppel is wise but whether it is intended by the legislature." Astoria Fed. Sav.

& Loan Ass'n v. Solimino, 501 U.S. 104, 108 (1991). In enacting §§ 251 and 252 of the Act,

Congress clearly intended to supplant common law claim preclusion with respect to issues

involving local interconnection. See Iowa Network Servs., Inc. v. Qwest Corp., 363 F.3d 683,

692 (8th Cir. 2004) ("Federal courts have the ultimate power to interpret provisions of the 1996

Act . . . ."); MCI Telecomms. Corp. v. BellSouth Telecomms. Corp., 7 F. Supp. 2d 674, 680

(E.D.N.C. 1998) (Addressing an issue regarding the interpretation of the Act on its merits

because "[t]o hold otherwise would be to rely on an exhaustion of state remedies argument

which does not seem to apply here, where Congress has devised an entirely new scheme.").

Thus, the court will proceed to consider the issue on its merits.

The RLEC defendants claim that the NCUC had the authority to modify the TELRIC guidelines pursuant to § 251(f)(2) of the Act, which provides in part:

> A local exchange carrier with fewer than 2 percent of the Nation's subscriber lines installed in the aggregate nationwide may petition a State commission for a suspension or modification of the application of a requirement or requirements of subsection (b) or (c) of this section to telephone exchange service facilities specified in such petition.

47 U.S.C. § 251(f)(2). Plaintiffs argue that this section gives state commissions limited authority to suspend or modify the requirements of subsections (b) and (c) of section 251 and that it does not authorize the alteration of any other provision of the Act. Therefore, plaintiffs claim, § 251(f)(2) does not give the NCUC the authority to suspend or modify the pricing standards set forth in § 252(d), upon which the TELRIC rules are based. In response, the RLEC defendants argue that the NCUC's power to suspend or modify the duty to establish reciprocal compensation arrangements under § 251(b)(5) necessarily includes the power to suspend or modify federal pricing standards under § 252(d).

Here, the language of § 251(f)(2) is plain, in that it only references suspensions or modifications of the requirements of subsections (b) and (c) of § 251. "However, because the 'meaning of statutory language, plain or not, depends on context,' we must consider 'not only the bare meaning of the word[s] but also [their] placement and purpose in the statutory scheme.'" Universal Mar. Serv. Corp. v. Wright, 155 F.3d 311, 319-320 (4th Cir. 1998) (quoting Bailey v. United States, 516 U.S. 137, 145 (1995)) (internal quotation marks omitted). Furthermore, "[w]hen a statute is part of a larger Act . . . , the starting point for ascertaining legislative intent is to look to other sections of the Act *in pari materia* with the statute under review." United

States v. Morison, 844 F.2d 1057, 1064 (4th Cir. 1988).

In this case, § 252(d)(2)(A)[18] of the Act explicitly refers to § 251(b)(5) of the Act, and, as previously mentioned, § 251(f)(2) explicitly permits state commissions to modify the requirements of § 251(b) under certain circumstances. Because both statutes refer to the same section of the Act, they are plainly meant to be construed together to give effect to each part. In other words, the pricing standards found in § 252(d)(2)(A) and the accompanying TELRIC regulations only have meaning in the context of the establishment of the reciprocal compensation arrangements required by § 251(b)(5) of the Act.

Furthermore, the FCC has expressly recognized that a state commission, such as the NCUC, has the authority to suspend or modify the application of TELRIC rules with respect to rural telephone companies. In 1996, the FCC issued its lengthy Local Competition Order, which addressed matters surrounding the implementation of the 1996 amendments to the Act. See Local Competition Order, 11 FCC Rcd.15499 (1996). In a section of this order entitled "Cost-Based Pricing Methodology," the FCC required that reciprocal compensation rates be based on forward-looking, i.e. TELRIC, studies. Id. at 16024 ¶ 1056. However, the FCC explicitly recognized that the general rule requiring rates to be established based on TELRIC studies is subject to an exception for small and rural LECs. The FCC specifically stated:

---

[18] This section provides in full:

For the purposes of compliance by an incumbent local exchange carrier with section 251(b)(5) of this title, a State commission shall not consider the terms and conditions for reciprocal compensation to be just and reasonable unless –

(I) such terms and conditions provide for the mutual and reciprocal recovery by each carrier of costs associated with the transport and termination on each carrier's network facilities of calls that originate on the network facilities of the other carrier; and

(ii) such terms and conditions determine such costs on the basis of a reasonable approximation of the additional costs of terminating such calls.

47 U.S.C. § 252(d)(2)(A)(I)-(ii).

> We have considered the economic impact of our rules in this section on small incumbent LECs. For example, we conclude that termination rates for all LECs should include an allocation of forward-looking common costs, but find that the inclusion of an element for the recovery of lost contribution may lead to significant distortions in local exchange markets. We also note that certain small incumbent LECs are not subject to our rules under section 251(f)(1) of the 1996 Act, unless otherwise determined by a state commission, <u>and certain other small incumbent LECs may seek relief from their state commissions from our rules under section 251(f)(2) of the 1996 Act.</u>

<u>Id.</u> at 16026 ¶ 1059. Thus, the <u>Local Competition Order</u> leaves no doubt that the FCC intended state commissions to have the authority to modify the TELRIC pricing requirements for RLECs. As a result, the court concludes that the plaintiffs' argument with respect to this issue must fail.[19]

D.      <u>NCUC's Factual Findings Regarding Reciprocal Compensation Rates</u>

Finally, plaintiffs challenge several of the NCUC's factual findings regarding the determination of the RLEC defendants' reciprocal compensation rates. Specifically, plaintiffs challenge rulings made by the NCUC regarding the calculation of MebTel's switch investment per line and regarding the appropriateness of Randolph's cost study. To the extent that plaintiffs' claims are based on the NCUC's lack of authority to modify the TELRIC pricing requirements, plaintiffs' claims are without merit for the reasons discussed in Section II.C., <u>supra</u>.

1.      <u>MebTel</u>

Plaintiffs first argue that the NCUC violated the "additional cost" standard of the Act by

---

[19] The court also notes that plaintiffs' construction of § 251(f)(2) leads to an illogical conclusion. As described by the NCUC:

> To read the Act the way that plaintiffs read it, [R]LECs would be [left] with a draconian choice – they could either not enter into reciprocal compensation arrangements with the CMRS providers, and thus receive no compensation for terminating cell phone traffic on their network, or they could perform expensive and time consuming TELRIC cost studies . . . . Either way they would face significant economic losses. The intent of the Act is to provide for fair competition, not destruction of [R]LECs.

NCUC's Mem. Resp. Mots. Summ. J. at 18.

including a portion of the cost of MebTel's investment in land, buildings, and general support for switches in the calculation of the reciprocal compensation rates. In determining reciprocal compensation rates, the Act specifies that costs be determined on the "basis of a reasonable approximation of the additional costs of terminating . . . calls." 47 U.S.C. § 252(d)(2)(A)(ii). The FCC has interpreted the "additional cost" standard to limit recovery to usage-sensitive costs only, which are costs that increase as the number of processed calls increase. Local Competition Order, 11 FCC Rcd. at 16025 ¶ 1057. See also Mem. Supp. Pls.' Mot. Summ. J. at 31.

In the Arbitration Order, the NCUC adopted the recommendation of the NCUC Public Staff that 49.75 percent of MebTel's switching investment costs are usage-sensitive. Arbitration Order at 58. In calculating this percentage, the NCUC included MebTel's switching investment in land, buildings, and general support. See Mem. Supp. Pls.' Mot. Summ. J. at 32. Plaintiffs claim that these costs are not usage-sensitive and therefore should not have been included in the calculations. Plaintiffs insist that only 38 percent of MebTel's switching investment costs are usage-sensitive.

The court reiterates that the NCUC's findings of fact are reviewed under the substantial evidence standard. GTE S., Inc. v. Morrison, 199 F.3d 733, 745 (4th Cir. 1999). The court first notes that the NCUC had the authority to modify the pricing guidelines and that, as a result, the RLEC defendants were properly released from conducting TELRIC studies. See Section II.C., supra. However, even in cases where the FCC has required an LEC to perform a TELRIC study, the inclusion of land and physical plant costs are part of the formula. See WorldNet Telecomms., Inc. v. TRB of Puerto Rico, Civil No. 08-1360, (FAB/BJM), 08-1359 (FAB/BJM), 2009 U.S. Dist. LEXIS 75560 at ** 81-84 (D.P.R. Aug. 25 2009) (recognizing that the value of

land on which carrier might build physical plants in the future could be included in establishing the proper TELRIC-compliant rate); In re WorldCom, Inc., 18 FCC Rcd. 17722, 17916 ¶ 497 (2003) (FCC adopted Verizon's TELRIC study, which included "land and building factors"); Local Competition Order, 11 FCC Rcd. at 15847 ¶ 682 (directly attributable forward-looking costs "typically include the investment costs and expenses related to primary plant . . . ."). Thus, the court finds that there is substantial evidence in the record to support the NCUC's determination with respect to this issue.

Plaintiffs also argue that MebTel's cost study impermissibly used embedded switch costs, i.e. the historical, book cost of its switch investment, as opposed to forward-looking switch costs. See RAO at 46; Mem. Supp. Pls.' Mot. Summ. J. at 34 n.126. In its Modification Order, the NCUC stated that the RLEC's cost studies "should be forward looking and reflect an efficient network to the extent practicable." Modification Order at 6 (emphasis added). See also Arbitration Order at 43. Here, there is substantial evidence in the record to show that obtaining a vendor quote for a new switch was not practicable for a small RLEC. Robert C. Schoonmaker, a telecommunications industry consultant with over thirty years of experience (see DE# 75-88 at 1:3-4), testified that:

> In order to get a realistic quote for a new switch you don't simply write a ten-minute letter that says give me a quote for a new switch. To get a serious quote from a manufacturer that reflects the cost of purchasing at[sic] the switch, you have to prepare a request for proposal that has specifications of the switch, number of trunks, number of ports, number of lines, what kinds of capabilities the switch needs to have for CALEA and all these things.
> Our firm does that. Typically just to prepare requests for proposals, it takes in the neighborhood of five to ten thousand dollars . . . . So the whole process to get a viable, realistic quote for a new switch is going to cost in the neighborhood of 10 to $20,000 and take the period of 60, 90 to 120 days.

Test. Robert C. Schoonmaker, DE #75-93 at 6:5-21.[20]

Although Mr. Schoonmaker testified on behalf of Randolph only, his testimony was general in nature and addressed all switch vendors. Thus, the court concludes that there was "more than a scintilla" of evidence to support the NCUC's decision with respect to this issue. AT&T Wireless PCS, Inc. v. City Council of Va. Beach, 155 F.3d 423, 430 (4th Cir. 1998).

2. Randolph

Unlike MebTel, Randolph did not propose a traditional reciprocal compensation cost study. Instead, Randolph utilized various formulae developed by the National Exchange Carrier Association ("NECA") for calculating interstate access charges for rural carriers. The NCUC approved Randolph's use of NECA data and formulas, finding that "the use of NECA formulae satisfies the requirement that the cost data should be easily verifiable . . . ." Arbitration Order at 87. Plaintiffs claim that Randolph's cost study cannot be verified, arguing that "[n]one of this information – the NECA formulae, the data used, the companies from which the data were derived – was introduced into evidence." Mem. Supp. Pls.' Mot. Summ. J. at 36.

Again, the testimony of Mr. Robert C. Schoonmaker addresses this issue. While plaintiffs are correct that the 610-page NECA cost study was not introduced into evidence, Mr. Schoonmaker did refer all parties and the NCUC to the study, which is found on the FCC's website. See Test. Robert C. Schoonmaker, DE # 75-88 at 8:10-14. The NECA's filing is a

---

[20] In addition, Mr. Schoonmaker supplied other reasons to support the NCUC's determination that a forward-looking quote was not realistic under the circumstances. Mr. Schoonmaker testified that "vendors are very reluctant to provide price quotes for switches solely for the purpose of establishing forward-looking costs in regulatory proceedings" for two reasons. Test. Robert C. Schoonmaker, DE # 75-89 at 10:13-15. First, vendors "often have a conflict of interest because they provide equipment to both wireline and wireless carriers . . . ." Id. at 10:16-17. Second, switch vendors are often concerned about providing data in a public proceeding regarding their prices and how they are developed, even if there are proprietary and confidentiality protections in place. Id. at 10:23, 11:1-2.

public document that was clearly referenced in Mr. Schoonmaker's testimony and was easily accessible via the website links that were provided by Mr. Schoonmaker. <u>Id.</u> at nn.1-2. The NCUC followed the NECA formulas and used the information provided by Mr. Schoonmaker to calculate Randolph's transport and termination rates. <u>See</u> RAO at 65; Arbitration Order at 87. Thus, plaintiffs' contention that there is not substantial evidence in the record to support the use of the NECA study is baseless.

Plaintiffs also argue that there is no evidence in the record to show that Randolph's cost study was based on data from similar companies. Again, Mr. Schoonmaker's testimony is relevant to this issue. Mr. Schoonmaker testified that he used NECA's traffic-sensitive formulas as a basis for Randolph's cost study because they are "well documented, easily obtainable, and produce a reasonable surrogate of Randolph's costs <u>since they are developed using actual costs of similarly-situated rural ILEC's</u>." Test. Robert C. Schoonmaker, DE # 75-88 at 9:11-13 (emphasis added). <u>See</u> <u>also</u> Arbitration Order at 86. Thus, plaintiffs' argument fails with respect to this issue.

Furthermore, plaintiffs argue that Randolph's reciprocal compensation rate improperly included the cost of upgrades to Randolph's switching software. Plaintiffs claim that Randolph's switch software upgrade investments were lump sum amounts and did not vary by usage. As a result, these investments were not usage-sensitive as required by federal law.

The NCUC fully explained the reasons for this decision on the record. <u>See</u> Arbitration Order at 105-106. For example, the NCUC stated that it had previously allowed large incumbent LECs under its jurisdiction to include software upgrades in the cost studies used to set TELRIC rates for unbundled network elements ("UNE") that incumbent LECs had to offer to competitors.

32

Id. at 106.  The NCUC noted that plaintiffs had not refuted this observation and it would be "contradictory" to allow large ILECs under NCUC jurisdiction to recover such costs in a TELRIC UNE proceeding while declining to allow Randolph to recover these costs in its non-TELRIC based reciprocal compensation rates.  Id.  Thus, this determination is supported by substantial evidence.[21]

Finally, plaintiffs claim that Randolph's cost study impermissibly used embedded switch costs.  For the same reasons discussed in Section II.D.1 with respect to MebTel, the court rejects plaintiffs' argument.

In summary, the court has considered all of plaintiffs' claims related to the determination of the RLECs' reciprocal compensation rates and has concluded that there is substantial evidence in the record to support all of the NCUC's factual findings.

### III.  CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment is DENIED.  The RLEC defendants' motion for summary judgment and the NCUC's motion for summary judgement are GRANTED.  Furthermore, the NCUC's 31 December 2008 Arbitration Order and the NCUC's 24 February 2009 approval order are AFFIRMED.  Plaintiffs' motion for oral argument is DENIED as moot.  The Clerk is directed to enter judgment for defendants and close this case.

This 30 September 2010.

---

[21] Furthermore, at least one federal court has determined that the inclusion of switch software upgrade is not inconsistent with TELRIC.  See AT&T Corp. v. FCC, 220 F.3d 607, 616-18 (D.C. Cir. 2000) (TELRIC principles were not violated where rates included not only new switches, but also more costly "growth additions" to existing switches). See also Mem. Supp. RLECs' Mot. Summ. J. at 33-34.

W. Earl Britt
Senior U.S. District Judge

34